ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
Email: Andrew@packardlawoffices.com

JASON R. FLANDERS (State Bar No. 198059)
Aqua Terra Aeris Law Group
409 45th Street
Oakland, CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Attorneys for Plaintiff
BATTLE CREEK ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BATTLE CREEK ALLIANCE,<br><br>         Plaintiff,<br><br>     vs.<br><br>SIERRA PACIFIC INDUSTRIES, INC.,<br><br>         Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

        BATTLE CREEK ALLIANCE ("the Alliance"), by and through its counsel, hereby

alleges:

## I.    <u>JURISDICTION AND VENUE</u>

        1.    This is a civil suit brought under the citizen suit enforcement provision of the

Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the

"CWA" or "the Act") against Sierra Pacific Industries, Inc. (referred to as "Defendant").

This Court has subject matter jurisdiction over the parties and the subject matter of this

action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201– 2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. On or about April 29, 2016, Plaintiff provided written notice to Defendant, via certified mail, of Defendant's violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendant, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of the Alliance's CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3. More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendant and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in Sacramento,

California, because the sources of the violations are located within Tehama County.

## II.   <u>INTRODUCTION</u>

5.   This Complaint seeks relief for Defendant's violations of the CWA at the approximately 40-acre millwork facility owned and/or operated by Defendant (the "Facility").  The Facility is located at 11605 Reading Road, in Red Bluff, California. Defendant discharges pollutant-contaminated storm water from the Facility into storm water conveyances, which ultimately drain to the Sacramento River and the Sacramento-San Joaquin Bay Delta ("the Delta").  Defendant is in violation of both the substantive and procedural requirements of the CWA.

6.   Defendant's discharge of pollutant-contaminated storm water from the Facility is in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.   The failure on the part of industrial facility operators such as Defendant to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Sacramento River and the Delta.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Sacramento River and the Delta.

Complaint For Declaratory and                                                            Case No.
Injunctive Relief and Civil Penalties

### III.   PARTIES

8.      The Alliance is a project of Signal of Love Communications, Inc. a non-profit public benefit corporation organized under the laws of California, with its main office in Montgomery Creek, California.  The Alliance is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which SPI discharges polluted storm water.  To further its goals, the Alliance actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of the Alliance, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Sacramento River and the Delta, into which Defendant causes pollutants to be discharged.  These Alliance members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendant's discharge of storm water containing pollutants impairs each of those uses.  Thus, the interests of the Alliance's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.

10.     Members of the Alliance reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of the Alliance use and enjoy the waters of the Sacramento River and the Delta, into which Defendant have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of the Alliance use these areas to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of the Alliance's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

4

1    11.    Continuing commission of the acts and omissions alleged above will

2 irreparably harm Plaintiff and the citizens of the State of California, for which harm they have

3 no plain, speedy or adequate remedy at law.

4    12.    Plaintiff is informed and believes, and thereupon alleges that Defendant owns

5 and/or operates the Facility.

6

7 **IV.    LEGAL BACKGROUND**

8    **A.    Clean Water Act**

9    13.    Congress enacted the CWA to "restore and maintain the chemical, physical,

10 and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes

11 an "interim goal of water quality which provides for the protection and propagation of fish,

12 shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. §

13 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-

14 based approach to regulating discharges of pollutants from point sources into waters of the

15 United States.

16    14.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

17 pollutant from a point source into waters of the United States, unless such discharge is in

18 compliance with various enumerated sections of the Act.  Among other things, Section

19 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES

20 permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

21    15.    The term "discharge of pollutants" means "any addition of any pollutant to

22 navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to

23 include, among other examples, industrial waste, chemical wastes, biological materials, heat,

24 rock, and sand discharged into water.  33 U.S.C. § 1362(6).

25    16.    A "point source" is defined as "any discernible, confined and discrete

26 conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . .

27 from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

28    17.    "Navigable waters" means "the waters of the United States." 33 U.S.C.

Complaint For Declaratory and                                          Case No.
Injunctive Relief and Civil Penalties

§ 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     The Sacramento River and the Delta are heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have placed both waterbodies on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the Sacramento River and San Joaquin River Basin (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for

Complaint For Declaratory and                                                                     Case No.
Injunctive Relief and Civil Penalties

6

sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as zinc and aluminum.

22.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to the Sacramento River and the Delta, and includes limits for several toxic metals, including zinc.

### C.     California Industrial Storm Water General Permit

23.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

24.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

25.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

Complaint For Declaratory and                                                                    Case No.
Injunctive Relief and Civil Penalties

27.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

30.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code. Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

31.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and

BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendant: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Chemical Oxygen Demand – 120 mg/L; and, Aluminum – 0.75 mg/L.

33.     The Regional Board has established water quality standards for the Sacramento River and the Delta in the Basin Plan.

34.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."  III-8.01 Basin Plan.

35.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."  III-3.00 Basin Plan.

36.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  *Id.*

37.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following applicable numeric limit for freshwater surface waters:  zinc – 0.12 mg/L (maximum concentration), subject to water hardness.

38.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

39.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking

System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions. General Permit, Section X.B.

40. Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit. In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice. General Permit, Section X.H.2.

41. Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI. The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. General Permit, Section XX.B.

42. Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

43. The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit. General Permit, Section III. B.

44. The General Permit requires dischargers to implement a Monitoring Implementation Plan. General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all storm water discharge locations. General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. General Permit, Section XI.A.1 and

2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

45.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

46.     Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

## V.  STATEMENT OF FACTS

47.     The Facility is classified as conforming to Standard Industrial Classification ("SIC") Code 2431 ("Millwork, Veneer, Plywood").  Industrial activities occur throughout the Facility.  The Alliance's investigation into the industrial activities at Defendant's approximately 40-acre facility indicates that the Facility is used to manufacture windows and doors.  Moreover, the Facility is used, or has been used in the past, for hazardous material storage, storage of spare equipment and materials, the maintenance of rolling stock, product unloading, and truck maintenance and fueling.

48.     Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiff is informed and believes that Defendant's storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

49.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

50.     During rain events, storm water laden with pollutants discharges from the Facility to storm water conveyances, which ultimately drain to the Sacramento River and the Delta.

51.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

52.     Information available to Plaintiff indicates that Defendant has not fulfilled the

Complaint For Declaratory and
Injunctive Relief and Civil Penalties                                                    Case No.

12

requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

53.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

54.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

55.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has not sampled with adequate frequency, has not conducted visual monitoring, and has not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

56.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

57.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

58.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

59.      Plaintiff is informed and believes, and thereupon alleges, that since at least April 29, 2011, Defendant has been discharging polluted storm water from the Facility into storm water conveyances, which ultimately drain to the Sacramento River and the Sacramento-San Joaquin Delta in violation of the General Permit.

60.      During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into storm water conveyances, which ultimately drain to the Sacramento River and the Sacramento-San Joaquin Bay Delta.

61.      Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

62.      Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

63.      Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

64.      Plaintiff is informed and believes, and thereupon alleges, that every day since April 29, 2011, Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

65.      Every day Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since April 29, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

Complaint For Declaratory and                                          Case No.
Injunctive Relief and Civil Penalties

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

66.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

67.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

68.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

69.     Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendant continues to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

70.     Each day that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since April 29, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

72.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

73.     Defendant has failed to implement BAT and BCT at the Facility for their discharges of TSS, zinc, aluminum, and COD in violation of Effluent Limitation D.32 of the General Permit.

74.     Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

75.     Defendant continues to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

76.     Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least April 29, 2011.  Defendant is subject to civil penalties for each and every violation of the Act since April 29, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FOURTH CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

77.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

78.     Section X.I and Section XI. of the General Permit require dischargers of storm

Complaint For Declaratory and                                          Case No.
Injunctive Relief and Civil Penalties

water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

79.     Defendant has failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendant's ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including Total Suspended Solids – 100 mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, and Chemical Oxygen Demand – 120 mg/L, as the General Permit requires, and its failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

80.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since at least April 29, 2011.  These violations are ongoing and continuous.

81.      Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendant are subject to civil penalties for each and every violation of the Act since April 29, 2011.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VII.   RELIEF REQUESTED

Wherefore, the Alliance respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as

1  alleged herein;

2      b.  Enjoin Defendant from discharging pollutants from the Facility and to the

3  surface waters surrounding and downstream from the Facility in violation of the Act and the

4  General Permit;

5      c.  Enjoin Defendant from further violating the substantive and procedural

6  requirements of the General Permit;

7      d.  Order Defendant to pay civil penalties of $37,500 per day per violation for

8  all violations occurring after April 29, 2011, pursuant to Sections 309(d) and 505(a) of the

9  Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

10      e.  Order Defendant to take appropriate actions to restore the quality of

11  navigable waters impaired by their activities;

12      f.  Award Plaintiff's costs and fees (including reasonable attorney, witness, and

13  consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

14      g.  Award any such other and further relief as this Court may deem appropriate.

15

16  Dated: July 1, 2016            Respectfully Submitted,

17                           LAW OFFICES OF ANDREW L. PACKARD

18

19                By:     /s/ Andrew L. Packard

20                         Andrew L. Packard
                       Attorneys for Plaintiff

21                         BATTLE CREEK ALLIANCE

22

23

24

25

26

27

28

**EXHIBIT A**

Law Offices Of

# ANDREW L. PACKARD

100 Petaluma Blvd N, Ste 301, Petaluma, CA 94952
Phone (707) 763-7227   Fax (707) 763-9227
Info@PackardLawOffices.com

April 29, 2016

**VIA CERTIFIED MAIL**

George Emmerson, President                     James Nevers, Plant Manager
Sierra Pacific Industries, Inc.                     Sierra Pacific Industries, Inc.
19794 Riverside Avenue                            Red Bluff Windows
Anderson, CA 96007                                 11605 Reading Road
                                                           Red Bluff, CA 96080

David H. Dun, Agent for Service of Process
Sierra Pacific Industries, Inc.
2313 I Street
Eureka, CA 95501

RE:     **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE**
        **FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")**
        **(33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Emmerson and Mr. Nevers,

        This firm represents Battle Creek Alliance ("the Alliance"), a California non-profit
association, in regard to violations of the Clean Water Act ("CWA" or "the Act") occurring at
Sierra Pacific Industries, Inc.'s Red Bluff Windows Facility (the "Facility"). This letter is being
sent to you as the responsible owners, officers, and/or operators of the Facility.  Unless otherwise
noted, Sierra Pacific Industries, Inc., shall hereinafter be collectively referred to as "SPI," and
George Emmerson and James Nevers shall hereinafter be collectively referred to as the
"Owners/Operators." The Alliance is a non-profit association dedicated to the preservation,
protection, and defense of the environment, wildlife, and natural resources of California waters,
including the waters into which SPI discharges polluted storm water.

        SPI is in ongoing violation of the substantive and procedural requirements of the CWA,
33 U.S.C. § 1251 *et seq.* and California's General Industrial Storm Water Permit, National
Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("General
Permit"), Water Quality Order No. 97-03-DWQ ("1997 General Permit"), as superseded by
Order No. 2015-0057-DWQ ("2015 General Permit").[1]

        On July 1, 2015 the 2015 General Permit went into effect, superseding the 1997 General
Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes
many of the same fundamental requirements and implements many of the same statutory
requirements as the 1997 General Permit. Violation of both the 1997 and 2015 General Permit

_____

[1] SPI submitted a NOI to comply with the General Permit for the Facility on or about June 10,
2015.

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 2 of 11

provisions is enforceable under the law. 2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects SPI to a penalty of up to $37,500 per day, per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violation and Intent to File Suit. In addition to civil penalties, the Alliance will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) of the Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees including attorneys' fees.

The CWA requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. 135.2.

As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, the Alliance intends to file suit under Section 505(a) of the Act (33 U.S.C. § 1365(a)) in federal court against Sierra Pacific Industries, Inc. for violations of the Act and Permit.

I.     **Background**

A.     **The Clean Water Act**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of an NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through

individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

**B.      California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which the Alliance refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For purposes of this notice letter, the Alliance refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

**C.      SPI's Red Bluff Windows Facility**

SPI's primary industrial activities at the approximately 40-acre millwork facility include window and door manufacturing, rolling stock maintenance, truck maintenance and fueling, product unloading and shipping, hazardous material storage, and storage of spare equipment and materials in a boneyard. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 2431 – Millwork, Veneer, Plywood.

SPI collects and discharges storm water associated with industrial activities through at least five (5) discharge locations as identified in the Facility's SWPPP. These discharges enter storm water conveyances, which ultimately drain to the Sacramento River and the Sacramento-San Joaquin Bay Delta ("the Delta"). The Delta, the Sacramento River, and the waterways that receive storm water discharge from the Facility are all waters of the United States within the

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 4 of 11

meaning of the CWA.

      The General Permit requires SPI to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 2431 must also analyze storm water samples for chemical oxygen demand ("COD"). 1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

## II.    SPI's Violations of the Act and General Permit

      Based on its review of available public documents, the Alliance is informed and believes that SPI is in ongoing violation of both the substantive and procedural requirements of the CWA, and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, SPI is subject to penalties for violations of the Act since April 28, 2011.

### A.    SPI Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations.

      SPI's storm water sampling results provide conclusive evidence of Sierra Pacific Industries failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

#### 1.    Applicable Water Quality Standards

      The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

      Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 5 of 11

pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id.*

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least one of the pollutants discharged by SPI:  Zinc – 0.12 mg/L (maximum concentration).

The *Water Quality Control Plan, Fourth Edition (Revised August 2006), for the Sacramento and San Joaquin River Basins* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to SPI's storm water discharges. The Basin Plan identifies present and potential uses for the Sacramento River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

## 2. Applicable Effluent Limitations

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by SPI: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Aluminum – 0.75 mg/L; Chemical Oxygen Demand – 120 mg/L; and Oil & Grease – 15.0 mg/L.

## 3. Sierra Pacific Industries' Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations, and effluent limitations of the permit.

### a. Discharge of Storm Water Containing Total Suspended Solids

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 6 of 11

**(TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/29/2016 | Outfall B | TSS | 213 | 100 |
| 1/9/2016 | Outfall B | TSS | 129 | 100 |
| 12/18/2015 | Outfall B | TSS | 259 | 100 |
| 12/3/2015 | Outfall B | TSS | 194 | 100 |
| 10/31/2014 | Outfall B | TSS | 200 | 100 |
| 11/19/2013 | Outfall B | TSS | 165 | 100 |
| 11/19/2013 | Outfall C | TSS | 312 | 100 |
| 11/28/2012 | Outfall B | TSS | 256 | 100 |
| 3/13/2012 | Outfall B | TSS | 243 | 100 |

      **b.**    **Discharges of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|---|---|---|---|---|---|
| 1/9/2016 | Outfall C | Zn | 0.188 | 0.117 | 0.12 |
| 1/9/2016 | Outfall D | Zn | 0.764 | 0.117 | 0.12 |
| 1/9/2016 | Outfall E | Zn | 0.306 | 0.117 | 0.12 |
| 1/4/2016 | Outfall C | Zn | 0.284 | 0.117 | 0.12 |
| 1/4/2016 | Outfall D | Zn | 0.713 | 0.117 | 0.12 |
| 12/21/2015 | Outfall A | Zn | 0.119 | 0.117 | 0.12 |
| 12/18/2015 | Outfall C | Zn | 0.134 | 0.117 | 0.12 |
| 12/18/2015 | Outfall D | Zn | 0.387 | 0.117 | 0.12 |
| 12/9/2015 | Outfall E | Zn | 0.623 | 0.117 | 0.12 |
| 12/3/2015 | Outfall C | Zn | 0.276 | 0.117 | 0.12 |
| 12/3/2015 | Outfall D | Zn | 0.582 | 0.117 | 0.12 |
| 12/3/2015 | Outfall E | Zn | 0.657 | 0.117 | 0.12 |
| 11/19/2014 | Outfall D | Zn | 1.23 | 0.117 | 0.12 |
| 11/19/2014 | Outfall C | Zn | 0.402 | 0.117 | 0.12 |
| 11/13/2014 | Outfall B | Zn | 0.201 | 0.117 | 0.12 |
| 10/31/2014 | Outfall E | Zn | 0.49 | 0.117 | 0.12 |
| 10/23/2014 | Outfall D | Zn | 1.11 | 0.117 | 0.12 |
| 10/23/2014 | Outfall C | Zn | 0.369 | 0.117 | 0.12 |
| 10/23/2014 | Outfall E | Zn | 1.26 | 0.117 | 0.12 |
| 2/6/2014 | Outfall C | Zn | 0.498 | 0.117 | 0.12 |
| 2/6/2014 | Outfall D | Zn | 1.69 | 0.117 | 0.12 |

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 7 of 11

| 2/6/2014 | Outfall E | Zn | 1.85 | 0.117 | 0.12 |
|---|---|---|---|---|---|
| 11/19/2013 | Outfall C | Zn | 0.54 | 0.117 | 0.12 |
| 11/19/2013 | Outfall D | Zn | 0.983 | 0.117 | 0.12 |
| 11/19/2013 | Outfall E | Zn | 2.44 | 0.117 | 0.12 |
| 4/4/2013 | Outfall D | Zn | 0.877 | 0.117 | 0.12 |
| 12/28/2012 | Outfall D | Zn | 0.897 | 0.117 | 0.12 |
| 11/28/2012 | Outfall E | Zn | 0.698 | 0.117 | 0.12 |
| 3/13/2012 | Outfall C | Zn | 0.302 | 0.117 | 0.12 |
| 3/13/2012 | Outfall D | Zn | 1.99 | 0.117 | 0.12 |
| 3/13/2012 | Outfall E | Zn | 1.31 | 0.117 | 0.12 |
| 1/19/2012 | Outfall C | Zn | 0.272 | 0.117 | 0.12 |
| 1/19/2012 | Outfall D | Zn | 1.97 | 0.117 | 0.12 |
| 1/19/2012 | Outfall E | Zn | 1.46 | 0.117 | 0.12 |

**c.     Discharges of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 11/19/2013 | Outfall B | COD | 148 | 120 |
| 11/8/2012 | Outfall C | COD | 247 | 120 |

**d.     Discharges of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/29/2016 | Outfall B | Al | 11.2 | 0.75 |
| 1/9/2016 | Outfall B | Al | 7.26 | 0.75 |
| 1/9/2016 | Outfall C | Al | 1.95 | 0.75 |
| 1/4/2016 | Outfall C | Al | 2.96 | 0.75 |
| 12/18/2015 | Outfall B | Al | 10.5 | 0.75 |
| 12/18/2015 | Outfall C | Al | 3.28 | 0.75 |
| 12/3/2015 | Outfall C | Al | 5.16 | 0.75 |
| 12/3/2015 | Outfall B | Al | 9.72 | 0.75 |

**e.     Discharges of Storm Water Exceeding the Basin Plan Standards for pH**

| Date | Discharge Point | Parameter | Concentration in Discharge (pH units) | Basin Plan (pH units) |
|---|---|---|---|---|
| 11/28/2012 | Outfall E | pH | 6.15 | 6.5 – 8.5 |

| 11/8/2012 | Outfall C | pH | 6.29 | 6.5 – 8.5 |
| 11/1/2012 | Outfall E | pH | 6.29 | 6.5 – 8.5 |

### f.   SPI's Sample Results Are Evidence of Violations of the General Permit

SPI's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations, and effluent limitations set forth above. The Alliance is informed and believes that the SPI has known that its storm water contains pollutants at levels exceeding General Permit standards since at least April 28, 2011.

The Alliance alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which the Alliance alleges that SPI has discharged storm water containing impermissible levels of TSS, Zn, Al, and COD in violation of the General Permit. 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

### 4.   SPI Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

SPI has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. 1997 General Permit, Sections A.8.a(i–x); 2015 General Permit, Sections X.H.1(a–g).

SPI has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day the Owners/Operators have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). The violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit.

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 9 of 11

Accordingly, the Owners/Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least April 28, 2011.

## 5. SPI Has Failed to Develop and Implement an Adequate Storm Water Pollution Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General permit, Section A.

The Alliance's investigation indicates that SPI has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. SPI has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations.

Each day the Owners/Operators failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. The Owners/Operators have been in violation of these requirements at the Facility every day since at least April 7, 2011.

## III. Persons Responsible for the Violations

The Alliance puts SPI on notice that it is the entity responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, the Alliance puts SPI on formal notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Party

The name, address, and telephone number of the noticing party is as follows:

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 10 of 11

   Marily Woodhouse, Director
   Battle Creek Alliance
   P.O. Box 225
   Montgomery Creek, CA 96065
   (530) 474-5803
   www.thebattlecreekalliance.org

**V.**  **Counsel**

   The Alliance has retained legal counsel to represent it in this matter. Please direct all communications to:

| | |
|---|---|
| Andrew L. Packard | Jason R. Flanders |
| Megan E. Truxillo | Aqua Terra Aeris (ATA) Law Group |
| William N. Carlon | 409 45th Street |
| Law Offices Of Andrew L. Packard | Oakland, CA 94609 |
| 100 Petaluma Boulevard North, Suite 301 | (916) 202-3018 |
| Petaluma, CA 94952 | jrf@atalawgroup.com |
| (707) 763-7227 | |
| Andrew@PackardLawOffices.com | |

**VI.**  **Conclusion**

   The Alliance believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Sierra Pacific Industries, Inc., and its agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty (20) days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

_____
Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for Battle Creek Alliance

CWA Notice of Intent to Sue
SPI Red Bluff Windows
April 29, 2016
Page 11 of 11

## SERVICE LIST

### VIA CERTIFIED MAIL

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Jared Blumenfield, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

Hon. Loretta Lynch
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Pamela Creedon, Executive Officer
Central Valley Regional Water Quality
Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670

**ATTACHMENT A**
**Notice of Intent to File Suit, SPI (Red Bluff, CA)**
**Significant Rain Events,***
**April 29, 2011 – April 29, 2016**

| | | | | | | | | |
|------|----|------|------|----|------|------|----|------|
| May  | 8  | 2011 | Mar. | 14 | 2012 | Dec. | 23 | 2012 |
| May  | 15 | 2011 | Mar. | 15 | 2012 | Dec. | 24 | 2012 |
| May  | 16 | 2011 | Mar. | 16 | 2012 | Dec. | 25 | 2012 |
| May  | 17 | 2011 | Mar. | 24 | 2012 | Dec. | 26 | 2012 |
| May  | 18 | 2011 | Mar. | 25 | 2012 | Dec. | 29 | 2012 |
| May  | 25 | 2011 | Mar. | 26 | 2012 | Jan. | 5  | 2013 |
| May  | 26 | 2011 | Mar. | 27 | 2012 | Jan. | 6  | 2013 |
| May  | 29 | 2011 | Mar. | 28 | 2012 | Jan. | 23 | 2013 |
| Jun. | 4  | 2011 | Mar. | 31 | 2012 | Jan. | 24 | 2013 |
| Jun. | 5  | 2011 | Apr. | 1  | 2012 | Feb. | 8  | 2013 |
| Jun. | 28 | 2011 | Apr. | 10 | 2012 | Feb. | 19 | 2013 |
| Jun. | 29 | 2011 | Apr. | 11 | 2012 | Feb. | 20 | 2013 |
| Oct. | 4  | 2011 | Apr. | 12 | 2012 | Mar. | 5  | 2013 |
| Oct. | 5  | 2011 | Apr. | 13 | 2012 | Mar. | 6  | 2013 |
| Oct. | 6  | 2011 | Apr. | 14 | 2012 | Mar. | 20 | 2013 |
| Oct. | 10 | 2011 | May  | 3  | 2012 | Mar. | 31 | 2013 |
| Oct. | 11 | 2011 | May  | 4  | 2012 | Apr. | 4  | 2013 |
| Nov. | 3  | 2011 | Jun. | 4  | 2012 | Apr. | 5  | 2013 |
| Nov. | 4  | 2011 | Jun. | 5  | 2012 | May  | 17 | 2013 |
| Nov. | 19 | 2011 | Oct. | 22 | 2012 | May  | 28 | 2013 |
| Nov. | 20 | 2011 | Oct. | 31 | 2012 | Jun. | 25 | 2013 |
| Nov. | 23 | 2011 | Nov. | 8  | 2012 | Jun. | 26 | 2013 |
| Nov. | 24 | 2011 | Nov. | 16 | 2012 | Sep. | 21 | 2013 |
| Jan. | 19 | 2012 | Nov. | 17 | 2012 | Sep. | 22 | 2013 |
| Jan. | 20 | 2012 | Nov. | 20 | 2012 | Nov. | 19 | 2013 |
| Jan. | 21 | 2012 | Nov. | 28 | 2012 | Nov. | 20 | 2013 |
| Jan. | 22 | 2012 | Nov. | 29 | 2012 | Nov. | 21 | 2013 |
| Jan. | 23 | 2012 | Nov. | 30 | 2012 | Dec. | 6  | 2013 |
| Jan. | 25 | 2012 | Dec. | 1  | 2012 | Dec. | 7  | 2013 |
| Jan. | 26 | 2012 | Dec. | 2  | 2012 | Feb. | 6  | 2014 |
| Jan. | 27 | 2012 | Dec. | 4  | 2012 | Feb. | 7  | 2014 |
| Feb. | 7  | 2012 | Dec. | 5  | 2012 | Feb. | 8  | 2014 |
| Feb. | 8  | 2012 | Dec. | 15 | 2012 | Feb. | 9  | 2014 |
| Feb. | 12 | 2012 | Dec. | 16 | 2012 | Feb. | 10 | 2014 |
| Feb. | 13 | 2012 | Dec. | 17 | 2012 | Feb. | 12 | 2014 |
| Feb. | 28 | 2012 | Dec. | 20 | 2012 | Feb. | 13 | 2014 |
| Feb. | 29 | 2012 | Dec. | 21 | 2012 | Feb. | 26 | 2014 |
| Mar. | 13 | 2012 | Dec. | 22 | 2012 | Feb. | 27 | 2014 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

| Feb. | 28 | 2014 | Nov. | 22 | 2014 | Sep. | 16 | 2015 |
|------|-----|------|------|-----|------|------|-----|------|
| Mar. | 1 | 2014 | Nov. | 28 | 2014 | Oct. | 18 | 2015 |
| Mar. | 3 | 2014 | Nov. | 29 | 2014 | Oct. | 19 | 2015 |
| Mar. | 4 | 2014 | Nov. | 30 | 2014 | Nov. | 1 | 2015 |
| Mar. | 5 | 2014 | Dec. | 1 | 2014 | Nov. | 2 | 2015 |
| Mar. | 6 | 2014 | Dec. | 2 | 2014 | Nov. | 8 | 2015 |
| Mar. | 9 | 2014 | Dec. | 3 | 2014 | Nov. | 9 | 2015 |
| Mar. | 10 | 2014 | Dec. | 4 | 2014 | Nov. | 10 | 2015 |
| Mar. | 25 | 2014 | Dec. | 5 | 2014 | Nov. | 15 | 2015 |
| Mar. | 26 | 2014 | Dec. | 6 | 2014 | Nov. | 16 | 2015 |
| Mar. | 29 | 2014 | Dec. | 8 | 2014 | Nov. | 24 | 2015 |
| Mar. | 30 | 2014 | Dec. | 9 | 2014 | Nov. | 25 | 2015 |
| Mar. | 31 | 2014 | Dec. | 10 | 2014 | Dec. | 3 | 2015 |
| Apr. | 1 | 2014 | Dec. | 11 | 2014 | Dec. | 4 | 2015 |
| Apr. | 2 | 2014 | Dec. | 12 | 2014 | Dec. | 6 | 2015 |
| Apr. | 24 | 2014 | Dec. | 13 | 2014 | Dec. | 7 | 2015 |
| Apr. | 25 | 2014 | Dec. | 15 | 2014 | Dec. | 9 | 2015 |
| Apr. | 26 | 2014 | Dec. | 16 | 2014 | Dec. | 10 | 2015 |
| May | 5 | 2014 | Dec. | 17 | 2014 | Dec. | 13 | 2015 |
| May | 6 | 2014 | Dec. | 18 | 2014 | Dec. | 14 | 2015 |
| May | 7 | 2014 | Dec. | 19 | 2014 | Dec. | 18 | 2015 |
| May | 19 | 2014 | Dec. | 20 | 2014 | Dec. | 19 | 2015 |
| May | 20 | 2014 | Dec. | 21 | 2014 | Dec. | 20 | 2015 |
| Aug | 5 | 2014 | Feb. | 2 | 2015 | Dec. | 21 | 2015 |
| Sep. | 24 | 2014 | Feb. | 3 | 2015 | Dec. | 22 | 2015 |
| Sep. | 25 | 2014 | Feb. | 6 | 2015 | Jan. | 4 | 2016 |
| Sep. | 26 | 2014 | Feb. | 7 | 2015 | Jan. | 5 | 2016 |
| Oct. | 15 | 2014 | Feb. | 8 | 2015 | Jan. | 6 | 2016 |
| Oct. | 23 | 2014 | Feb. | 9 | 2015 | Jan. | 7 | 2016 |
| Oct. | 24 | 2014 | Mar. | 16 | 2015 | Jan. | 9 | 2016 |
| Oct. | 25 | 2014 | Mar. | 22 | 2015 | Jan. | 13 | 2016 |
| Oct. | 31 | 2014 | Mar. | 23 | 2015 | Jan. | 14 | 2016 |
| Nov. | 1 | 2014 | Apr. | 7 | 2015 | Jan. | 15 | 2016 |
| Nov. | 2 | 2014 | Apr. | 8 | 2015 | Jan. | 16 | 2016 |
| Nov. | 13 | 2014 | Apr. | 25 | 2015 | Jan. | 17 | 2016 |
| Nov. | 19 | 2014 | May | 11 | 2015 | Jan. | 18 | 2016 |
| Nov. | 20 | 2014 | May | 20 | 2015 | Jan. | 19 | 2016 |
| Nov. | 21 | 2014 | Sep. | 15 | 2015 | Jan. | 20 | 2016 |

| | | |
|---|---|---|
| Jan. | 21 | 2016 |
| Jan. | 22 | 2016 |
| Jan. | 23 | 2016 |
| Jan. | 24 | 2016 |
| Jan. | 25 | 2016 |
| Jan. | 29 | 2016 |
| Jan. | 30 | 2016 |
| Feb. | 17 | 2016 |
| Feb. | 18 | 2016 |
| Feb. | 19 | 2016 |
| Feb. | 20 | 2016 |
| Mar. | 3 | 2016 |
| Mar. | 4 | 2016 |
| Mar. | 5 | 2016 |
| Mar. | 6 | 2016 |
| Mar. | 7 | 2016 |
| Mar. | 9 | 2016 |
| Mar. | 10 | 2016 |
| Mar. | 11 | 2016 |
| Mar. | 12 | 2016 |
| Mar. | 13 | 2016 |
| Mar. | 20 | 2016 |
| Mar. | 21 | 2016 |
| Mar. | 22 | 2016 |
| Apr. | 9 | 2016 |
| Apr. | 10 | 2016 |
| Apr. | 12 | 2016 |
| Apr. | 13 | 2016 |